## CROM et al. v. CEMENT GUN CO.
### No. 145.

District Court, D. Delaware.

June 25, 1942.

E. Ennalls Berl, of Wilmington, Del., for plaintiffs.

Hugh M. Morris, of Wilmington, Del., for defendant.

## KIRKPATRICK, District Judge.

This is an action for infringement of U. S. patent No. 1,776,941, issued to Crom, one of the plaintiffs, and, in the alternative, for royalties under a license. For all purposes of this controversy the two plaintiffs, Crom and National Gunite, are one, and will be referred to in the singular wherever convenient. The patent is for a ditch trimmer—a very simple machine, the purpose of which is to prepare roughly excavated irrigation ditches or canals for lining with cement, by cutting the sides to the form of a perfectly smooth semicircle. The defendant has used and is using equipment covered by some if not all of the claims of the patent.

The first defence is that the defendant acquired a shop right to the invention—a right which, it is contended, has survived various transfers and licenses under the patent.

Under no circumstances can a shop right come into existence unless the inventor was an employee at the time when the invention was made and reduced to practice. I find as a fact that Crom was not an employee of the defendant in 1927 when the invention was made.

Crom had been at one time an ordinary employee of the defendant and, later, sales manager on a commission basis, but in April, 1923, he was a member of a partnership (Crom and Lindberg) which then entered into an independent contract with the defendant, under which the firm (1) acted as the defendant's exclusive sales agent in certain specified territory and (2) obtained and, jointly with the defendant, carried out construction contracts in which the defendant's cement spraying equipment was used. This relationship continued until January 26, 1928, when it was terminated by mutual agreement.

Neither Crom nor his partner received any salary from the defendant, the firm's compensation consisting of commissions on sales and a one half share of profits from the construction jobs. The firm paid its own expenses including the salaries of its office force. In case a loss was incurred on any construction job, fifty percent of it was carried over and charged against the firm's share of profits on other or subsequent jobs. The defendant financed the contracts, but six percent interest on its advances were charged against the profits of each job. Finally, although the defendant was given the right to send its officers to the place where the work was being carried on "for the purpose of supervision, inspection or direction," in case of a difference of opinion between it and the firm as to "methods of operation being employed" the matter was to be submitted to an arbiter whose decision, of course, might override the defendant in favor of the partnership. This provision alone, it seems to me, would be sufficient to negative the existence of a master and servant relationship. Control of the details of the work is a prime consideration in determining the nature of the relationship and in this case, the partnership had, on any show-down, as much chance of controlling such details as the defendant. See Restatement, Agency, §.220.

The remaining defences and the plaintiff's alternative claim for royalties, raise the following questions:

(1) Is there a subsisting license from the plaintiffs or either of them to the defendant?

(2) If so, is the plaintiff entitled to the royalties provided by it?

(3) Is the defendant estopped to assert the invalidity of the patent?

(1) The history of the dealings of the parties with this patent is mostly undisputed and proved by documentary evidence. The patent issued to Crom September 30, 1930. The contract between his firm and the defendant had ended in 1928, and in 1930 he and one Hession were the owners of the recently incorporated National Gunite Company. On May 13, 1931, Crom assigned the patent to the defendant as the first step of a plan for pooling this and another patent (Beasley and Leriche) through the medium of a corporation formed by the parties, called Canal Lining Company, which was to hold the patents and give licenses to the defendant, to National Gunite, and to two other corporations engaged in competing businesses. The defendant took and held the patent at this preliminary stage as a mere conduit for carrying out the scheme and was not then and has not been at any time since the beneficial owner. In accordance with the arrangement, the defendant promptly assigned the patent to the Canal Lining Company, which Company on June 23, 1931 gave a license under the two patents to each of the four corporations who had joined in creating it. The license to the defendant contained a covenant not to question the validity of the patents.

In March, 1933, Mair, the defendant's vice-president and treasurer, and acting for the defendant, agreed in writing to reassign the patent to Crom or National Gunite, if it should be returned to it by Canal Lining Company. At that time possible dissolution of Canal Lining Company was in the offing.

In 1934 it was finally decided (for reasons not material here) to dissolve Canal Lining Company. Its only assets consisted of the two patents and the four licenses which it had granted under them. As a preliminary to its dissolution assets were exposed to public sale and on December 21, 1935, were all bought in by Mair.

The only important disputed question of fact arises at this point and, upon it, I find that Mair bought the Crom patent in the capacity of a trustee to assign it unconditionally to Crom or National Gunite. On April 6, 1936, he did so assign it. I further find as a fact that neither Crom nor National Gunite ever assented to the suggestion contained in Mair's letter to Hession of December 13, 1934, to the effect that it should be made a condition of reassigning the patent to Crom that a free license under it be given to the defendant and to one of the other corporations, and I find that there never was any agreement to that effect.

It seems plain enough that the defendant, at some stage of its dealings with the plaintiff was advised or came to believe that it had a shop right in Crom's patent, and that many of the things which it said and wrote and many of the steps which it took (including the ex post facto free license by Mair to the defendant on June 19, 1939) were for the purpose of keeping such right alive. Inasmuch as no shop right had ever come into existence and the plaintiff never assented to the defendant's position in that regard, these steps and assertions were ineffective.

The net result of the foregoing history may be summed up by a quotation from the defendant's brief (Point V, p. 21) which is as follows: "The Cement Gun Company has a presently existing formal license under seal granted June 23, 1931 by Canal Lining Company when owner of the Crom patent in suit, and that license contract has never been cancelled or rescinded." I so find.

■ (2) The assignments of the patent from Canal Lining Company to Mair and from Mair to Crom carried the right to receive royalties under the outstanding license. "* * * Royalties to accrue and damages and profits for future infringements are incident to and accompany the patent unless separated by express reservation * * *." Chemical Foundation Inc. v. E. I. DuPont de Nemours & Co., D.C. 29 F.2d 597, 600. See, also, 48 C.J. Sec. 449, page 276.

Where an assignment conveys all the assignor's right, title and interest, if the right to receive royalties is to be severed from the beneficial ownership of the patent and remain in the assignor, there must be

an express reservation or some agreement to that effect. I do not think that the mere retention of the "license" (by which term the parties to this case apparently mean the paper evidencing the right to receive royalties) is sufficient to make the severance, particularly where, as in the present case, it is merely for the purpose of protecting a supposed but nonexistent shop right and is in contravention of the understanding of the parties.

█ The subsequent conduct of the parties, although somewhat contradictory on both sides, in general indicates that the understanding was that the assignment to Crom carried with it the right to royalties. After the assignment of the patent and up to 1939 the plaintiff received more than $7,000 from this defendant and one of the other companies in the Canal Lining pool in respect of work on which the apparatus of the Crom patent was used. These payments were at first denominated "royalties", but subsequently, on the request of the defendant, the term was changed to payments for "services." The facts remain that the patent was used and the money was paid, and the effort of the defendant's witness to assimilate the payments to something other than patent royalties strikes one as rather lame. That applies also to the defendant's argument drawn from the fact that the license provides for payments based on square feet of surface lined, without regard to whether the patented device had been used. It is perfectly plain that circle segment ditches could not be profitably built without the use of the patent, and the provision was a simple and watertight method of imposing a royalty upon its use.

(3) The defendant being not only a licensee but a licensee who has expressly covenanted not to question the patent, it follows that it is estopped to raise the issue of non-validity in this case.

█ True, the license was not directly granted by the plaintiff to the defendant, but the plaintiff is in privity with Canal Lining Company and stands for all purposes in its shoes. The law is too firmly settled in all jurisdictions to admit of question that a licensee or assignor is estopped to deny the validity of the patent. See United States v. Harvey Steel Co., 196 U. S. 310, 25 S.Ct. 240, 49 L.Ed. 492; Westinghouse Electric, etc., Co. v. Formica, etc., Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 99 F.2d 1. Even after the entry of a decree of invalidity in another suit the licensee is estopped to raise the question in respect of royalties accrued before the adjudication. Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 63 F.2d 853. Decisions following the general rule are too numerous to require further citations.

█ An exception has been recognized in some cases in which the owner of the patent sued the licensee for infringement. Cold Metal Process Co. v. United Engineering, etc., Co., D.C., 3 F.Supp. 120. Though various reasons have been given, the only logical basis for the exception is that, by suing in tort, the patent owner has repudiated the license and therefore cannot claim the advantages of the contract relation. Tate v. B. & O. R. Co., 4 Cir., 229 F. 141; Paramount Hosiery Form Drying Co. v. Moorhead Knitting Co., D. C., 251 F. 897. But where, as here, the license is asserted as the basis for a claim for royalties and infringement charged only as an alternative there is plainly no repudiation and no reason for not applying the general rule of estoppel.

It is not necessary to consider what the rule is in a case in which a licensee sets up invalidity to constitute the defense of want of consideration. This defense usually depends upon the existence of such general use of the patent by competitors as to make it worthless to the licensee, and the defendant in this case has not raised the question.

The case of Standard Water Systems Co. v. Griscom-Russell Co., 278 F. 703, a Third Circuit decision, requires some attention. The defendant cites it with the suggestion that the Third Circuit does not follow the general rule as to estoppel by license. In spite of some unnecessarily sweeping statements made by the Court in that opinion, I do not think that the decision has the effect of repudiating the general rule. The facts of the case were that the assignor was one of four defendants charged with conspiring with the three others to infringe the patent which he had assigned to the plaintiff. The Court below adjudged the patent valid and further held that all defendants were jointly infringing, but entered an injunction against only one of the four—not the assignor. Only the one enjoined appealed. What was before the Circuit Court of Appeals, there-

fore, was an adjudication of validity against a party, not the assignor (though a joint tort feasor with him in infringing), which, so far as the opinion shows, may have been based solely upon the estoppel of the assignor to deny validity. Whatever the basis of the adjudication, however, the estoppel was urged in the Circuit Court of Appeals. There was thus real reason for the Court's statement that the public was interested, because there was an unqualified adjudication that the patent was valid. Limited to its facts the case does not deny the general rule but merely establishes an exception to it under rather peculiar circumstances.

These circumstances do not exist in the present case. I am making no adjudication as to whether this patent is valid or invalid, but hold merely that this defendant is estopped to attack its validity and that that issue is therefore not before this Court. I cannot see how the public is interested in the question whether this defendant is bound by its contract and conduct under it to pay royalties to this plaintiff, which is all that is decided.

Subsequent decisions in the Third Circuit do not indicate any intention to depart from the general rule. In National Cash Register Co. v. Remington Arms Co., D.C., 283 F. 196, 198, the District Judge cited the Griscom-Russell case for the principle that "The assignor of a patent is estopped, when sued, by his assignee for infringement, to deny the validity of the patent he has sold." He refused, however, to enter a *preliminary* injunction because estoppel would have been the sole basis for such action, and on this point the Circuit Court of Appeals affirmed. National Cash Register Co. v. Remington Arms Co., 3 Cir., 286 F. 367. Subsequent opinions in the same case (Id., D.C., 293 F. 123; Id., 3 Cir., 4 F.2d 700) make no mention of the issue of estoppel. In the more recent case of United Engineering, etc., Co., v. Cold Metal Process Co., 3 Cir., 68 F.2d 564, Judge Buffington said " * * * it follows that, enjoying and possessing such license, the defendant is not in a position to contest the validity of its licensor's patent, the monopoly and rights to which it retains. Such holding is in line with recognized authorities."

In National Clay Products Co. v. Heath Unit Tile Co., 40 F.2d 617, 618, the Circuit Court of Appeals for the Eighth Circuit stated the case in terms which leave little doubt as to the rule to apply here. The Court said:

"The defense and counterclaims of defendant are based upon the insistence that the license is subsisting in it. Such being its position, and it being in the attitude of a licensee, it is estopped to deny the validity of the patents covered thereby. * * *

"Furthermore, the license contract itself provided: 'Validity of Patents. The licensee hereby acknowledges the validity of the Letters Patent, for the full term thereof, and agrees at no time either directly or indirectly to attack or question the validity thereof.'

"Appellant cannot claim that it is a licensee under and because of this contract and, at the same time, violate that contract in a very essential provision thereof."

This is precisely applicable to the present case, particularly in view of the defendant's position at the trial as indicated by his brief quoted herein.

The plaintiff's bill must therefore be sustained, and the plaintiff is entitled to an accounting for royalties accrued after the assignment of the patent to it on April 6, 1936. While it is true that the license covers two patents, one of which is not owned by the plaintiff, I do not think that fact presents any insuperable difficulty. I see no reason why an equitable apportionment can not be made upon an accounting. At any rate that question will have to be met when it arises.

The statements of facts contained in the foregoing opinion may be taken as special findings. The following are the Court's conclusions of law:

1. The contract of April 6, 1923 between Crom and Lindberg and Cement Gun Co. did not create an employer-employee relationship.

2. The defendant has never had a shop right in the Crom patent.

3. Nothing in the dealings of the parties or in the circumstances of this case operated as a matter of law to extinguish or change in any way the royalty provisions of the license of June 23, 1931, from Canal Lining Co. to Cement Gun Contracting Co., the defendant.

4. Mair, in purchasing the Crom patent at the public sale of the assets of Canal Lining Co., took it under a trust obligation to convey it unconditionally to the plaintiff.

5. The assignments of the Crom patent from Canal Lining Co., to Mair and from Mair to Crom (December 21, 1935, and April 6, 1936) carried the right to subsequently accruing royalties under the license, and such right is now vested in Crom.

6. Mair's letter of December 13, 1934, his free license to Cement Gun Company of June 19, 1939, and the alleged oral free license of March 14, 1936, therein recited, and all other acts on the part of the defendant intended to eliminate the royalty provisions, were without legal effort.

7. Mair's physical retention of the license contracts or papers did not effect a severance of the right to receive royalties from the beneficial ownership of the patent which was assigned.

8. The defendant is estopped to assert invalidity of the patent as a defense in this action.

9. The plaintiff is entitled to have an accounting for royalties earned since December 21, 1935.

Judgment is entered for the plaintiff in accordance with the foregoing.