In re CELLNET DATA SYSTEMS,
INC., Debtor.

Schlumberger Resource Management
Services, Inc., Appellant,

v.

Cellnet Data Systems, Inc., Appellee.

No. Civ.A. 01–8–RRM.
Bankruptcy No. 00–844.

United States District Court,
D. Delaware.

May 2, 2002.

Laura Davis Jones, Bruce Grohsgal, Pa-
chulski, Stang, Ziehl, Young & Jones, P.C.,
Wilmington, Delaware, Mary Grace Diehl,

Troutman Sanders, LLP, Atlanta, Georgia, for appellant.

Mark D. Collins, John H. Knight, Richards, Layton & Finger, P.A., Wilmington, Delaware, Mark Thompson, Simpson Thacher & Bartlett, New York City, for appellee.

## MEMORANDUM OPINION

MCKELVIE, District Judge.

This is a bankruptcy appeal. The debtor-appellee is CellNet Data Systems, Inc. Prior to its bankruptcy, CellNet was developing a wireless data network for meter reading. The appellant is Schlumberger Resource Management Services, Inc., which acquired a substantial amount of CellNet's assets and liabilities pursuant to an agreement approved by the Bankruptcy Court. Among the assets acquired by Schlumberger was CellNet's intellectual property, including patents, trademarks, copyrights, software, and other confidential and propriety information. In this dispute, the two parties both claim ownership of royalty rights for that intellectual property. Those royalties arose from earlier license agreements between CellNet and BCN Data Systems LLC, a joint venture between CellNet and Bechtel Enterprises, Inc. Schlumberger argues that it acquired from CellNet the right to receive the royalty payments from BCN when it acquired CellNet's intellectual property. CellNet argues that Schlumberger affirmatively excluded from the asset purchase all of CellNet's assets, liabilities, and agreements that pertained to CellNet's relationship with BCN, including the license agreements creating the right to royalties.

The Bankruptcy Court agreed with CellNet and held that Schlumberger, although the purchaser of the intellectual property, had refused the right to receive royalties on the intellectual property when it affirmatively excluded the license agreements from the assets it chose to purchase. Schlumberger appealed that decision to this court. Its appeal presents two issues for the court's decision. One, did Schlumberger acquire the right to receive royalties from BCN when it acquired CellNet's intellectual property, but excluded CellNet's license agreements with BCN? Two, if Schlumberger excluded the royalties from its acquisition, which party is entitled to those royalties when the licensee elects to enforce its rights under the license pursuant to 11 U.S.C. § 365(n)?

## I. FACTUAL BACKGROUND

On January 1, 1997, CellNet entered a License and Consulting Services Agreement with BCN. That agreement was one of several agreements between CellNet and BCN that set forth CellNet's obligations to the BCN joint venture. It provided that CellNet would grant BCN an exclusive license to use its intellectual property, including computer code, manufacturing rights, sublicense rights, trademarks and other property, outside the United States. BCN received the exclusive license in return for a royalty payment to CellNet of 3% of BCN's gross revenues. The Agreement also included a covenant that CellNet would provide technical support to BCN to support the technology. The two parties also entered into on that date an agreement entitled the OCDB Source Code License Agreement, a similar license for specific intellectual property not covered in the first agreement. The two contracts will be referred to as the "License Agreements."

More than three years later and just before CellNet declared bankruptcy, CellNet and Schlumberger executed a Proposal Letter pursuant to which Schlumberger would acquire "all or substantially all of the assets and business operations of [Cell-

Net] and its subsidiaries." The Proposal Letter, entered January 31, 2000, provided that Schlumberger "would acquire all assets of [CellNet] free and clear of all liens other than certain liens to be agreed (the 'Assets'), other than the Excluded Assets (as defined below), used in, held for use in, or related to the business and operations of [CellNet]." The term Excluded Assets was left open for future agreement by the parties.

CellNet filed its voluntary bankruptcy petition on February 4, 2000. On March 1, 2000, Schlumberger and CellNet entered an Asset Purchase Agreement that, like the Proposal Letter, provided Schlumberger would purchase "all of [CellNet's] right, title and interest in and to the Assets, other than the Excluded Assets." Rather than define the Excluded Assets, the Asset Purchase Agreement stated that:

> At any time prior to March 25, 2000, [Schlumberger] shall be entitled unilaterally to amend this Agreement, including without limitation Schedules 1.01(a)(i) (Stock Acquired), 1.01(b) (Excluded Contracts) and 1.01(e) (Excluded Assets) attached hereto, solely for the purpose of excluding any or all of the stock, assets, liabilities and agreements of [CellNet] pertaining to [CellNet's] joint venture with Bechtel Enterprises, Inc., or its affiliates, (collectively, the "*BCN Assets and Liabilities*") from the stock, assets, liabilities and agreements being acquired or assumed by [Schlumberger] hereunder.

Thus, the Asset Purchase Agreement sold CellNet's assets and liabilities, including its intellectual property, to Schlumberger, but vested in Schlumberger the right to exclude CellNet's stock, assets, liabilities and agreements "pertaining to" CellNet's joint venture with BCN. This group of stock, assets, liabilities and agreements was identified as the "BCN Assets and Liabilities," although it specifically included CellNet's agreements with BCN and provided for a schedule on which Schlumberger could list the contracts it wished to exclude from its acquisition. The Agreement also stated that disputes over it were to be governed by New York law and it contained an integration clause stating that it was the entire agreement of the parties and superseded all prior written or oral agreements.

On March 24, 2000, Schlumberger's counsel Colin F. Flannery sent a letter to CellNet in which it exercised its option to exclude the BCN Assets and Liabilities. The letter stated,

> In accordance with Section 5.15(a) of the Asset Purchase Agreement ... [Schlumberger] hereby elects to amend the Asset Purchase Agreement to exclude the BCN Assets and Liabilities from the stock, assets, liabilities and agreements of [CellNet] being acquired or assumed under the Asset Purchase Agreement.

The letter concluded with the comment that its capitalized terms "shall have the meanings they do in the Asset Purchase Agreement." Thus, Flannery's use of the term "BCN Assets and Liabilities" tracks the language of the agreement and excluded all of the "stock, assets, liabilities and agreements pertaining to [CellNet's] joint venture with" Bechtel. Moreover, the letter went on to designate the License Agreements, among many others, as contracts Flannery added to the list of "Excluded Contracts."

Sometime between Schlumberger's March 24 exclusion of the BCN Assets and Liabilities and the Bankruptcy Court's approval of the Asset Purchase Agreement on May 4, 2001, the parties disputed the right to collect royalties under the License Agreements. Schlumberger believed CellNet would be required to reject the Li-

cense Agreements as executory contracts pursuant to 11 U.S.C. § 365(a) because it could not fulfill the obligations of those agreements. To confirm this expectation, Schlumberger requested, during the final negotiations in preparation for seeking Bankruptcy Court approval of the sale, that CellNet reject the License Agreements. CellNet agreed and their agreement was memorialized in Amendment Number Three of the Asset Purchase Agreement, which was executed on May 4 and adds a new section to the Agreement entitled "Disposition of BCN License Agreements." That section states the following:

> [Schlumberger] has elected not to assume the License and Consulting Services Agreement between [CellNet] and BCN Data Systems, L.L.C. ("*BCN* "), dated January 1, 1997, the [OCDB License Agreement] between [CellNet] and BCN dated January 1, 1997 ... (collectively, the "*BCN License Agreements* "). [CellNet] shall obtain an order from the Bankruptcy Court pursuant to Section 365(a) of the Bankruptcy Code rejecting the BCN License Agreements. The parties hereto acknowledge that if BCN elects to retain its rights under the BCN License Agreements in accordance with Section 365(n)(1)(B) of the Bankruptcy Code, then the rights and obligations of the parties with respect to the License Agreements, including without limitation any royalty rights thereunder, are disputed by the parties. Each party reserves all rights under this Agreement with respect to the BCN License Agreements, and neither this Amendment nor any action taken in connection herewith, including the filing of any modified Sale Order, shall be deemed to be a waiver or admission of any matter related to the dispute between [CellNet] and [Schlumberger] regarding the BCN License Agreements.

Thus, as of May 4, the parties disputed to whom royalties were due under the BCN License Agreements. CellNet nonetheless agreed, however, that it would reject the various agreements pursuant to 11 U.S.C. § 365(a) at Schlumberger's request.

CellNet presented the Asset Purchase Agreement to the Bankruptcy Court for approval and that court held a hearing on May 4, 2001. The submission to the court included a Proposed Sale Order, stating that the assets were transferred from Cell-Net to Schlumberger "free and clear" of various claims and encumbrances, including licenses. BCN objected to that language of the Order and the parties eventually negotiated an addition to the Order's language to reflect the parties' agreement that its approval of the Asset Purchase Agreement did not affect the parties' rights to the BCN royalties. The Sale Order approved by the court on May 4 contained the following agreed language memorializing that the order had no effect on the parties' relative rights to the BCN royalties.

> Schlumberger, CellNet, BCN and Bechtel Enterprises, Inc. reserve all rights concerning the scope of the their respective rights and obligations under or in respect to the BCN License Agreements after giving effect to the Asset Sale. Nothing contained in the this Order constitutes an assumption and assignment of the BCN License Agreements under Section 365 of the Bankruptcy Code; nor does this Order determine what effect, if any subsequent orders of this Court under such section may have on the rights of BCN, CellNet or Schlumberger with respect to the BCN Rights, the BCN License Agreements or the Assets.

Final Sale Order at ¶ EE. Following approval, the parties to the Asset Purchase

Agreement closed the transaction on May 16, 2000.

On May 5, 2000, CellNet sought, and the Bankruptcy Court granted, an Order authorizing it to reject the BCN License Agreements under § 365(a) of the Bankruptcy Code. Section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In this case, CellNet was operating as the trustee because it was a debtor in possession pursuant to 11 U.S.C. § 1107(a) and was thus empowered to reject such agreements. CellNet's rejection of the License Agreements fulfilled its obligations under Amendment Three of the Asset Purchase Agreement. On May 25, 2000, CellNet formally sent notice to BCN that it was rejecting the License Agreements.

BCN chose to retain its rights under those agreements pursuant to 11 U.S.C. § 365(n). Section 365(n) provides that "[i]f a trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect" to either terminate the contract or retain certain rights under the license. Specifically, the licensee may elect:

> to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable non-bankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property ... as such rights existed immediately before the case commenced....

11 U.S.C. § 365(n)(1)(B). If a licensee elects to retain its rights, § 365(n)(2)(B) of the Code requires it to "make all royalty payments due under such contract for the duration of such contract...." BCN filed its notice of election to retain its rights under § 365(n) on May 19, 2000. Thus, BCN continued to license the intellectual property it originally received from CellNet and was obligated to continue to pay royalties on that license under § 365(n)(2)(B).

Rather than continue as a joint venture between Bechtel and CellNet, on May 23, 2000, BCN entered a Purchase Agreement with CellNet and Bechtel by which Bechtel acquired the assets and liabilities of BCN. Section 2.04(c) of that Purchase Agreement provided for a royalty advance payment from Bechtel, on behalf of BCN, to CellNet. The advance payment was $2,250,000 and covered, in full, all of BCN's future royalty obligations under the License Agreements. The Bankruptcy Court approved the Purchase Agreement on June 21, 2000. On July 12, 2000, the payment was placed in escrow pending the court's resolution of whether CellNet owned the right to royalties under the agreement. The $2,250,000 remains in escrow.

On August 21, 2000, CellNet presented a motion to the Bankruptcy Court to determine ownership of the BCN royalties. The court conducted a hearing on November 6, 2000 and found that CellNet owned the right to receive the BCN royalties. On November 9, 2000, the court entered an order granting CellNet's motion and awarding it the right to receive the royalties. Schlumberger filed a timely notice of appeal. This court heard argument on Schlumberger's appeal on March 26, 2001, and April 10, 2002. This is the court's decision on Schlumberger's appeal.

## II. DISCUSSION

CellNet argues that this is a simple case of contractual interpretation and that the plain meaning of Schlumberger's March 24, 2000 rejection of all BCN Assets

and Liabilities was that Schlumberger did not wish to acquire the License Agreements. Therefore, CellNet asserts it retained the right to receive royalties pursuant to those agreements. Schlumberger argues, in contrast, that the Asset Purchase Agreement and its later rejection of the BCN Assets and Liabilities, do not show that it intended to separate the right to royalties from the underlying ownership of the intellectual property. Instead, Schlumberger argues that it intended, as owner of the underlying intellectual property, to have exclusive control of its licensing and any resulting royalty payments. Alternatively, Schlumberger urges the court to look beyond its March 24, 2000 letter and find that because it owns the intellectual property, and because CellNet rejected the License Agreements, it has the superior rights to receive the royalties under § 365 of the Bankruptcy Code.

At the November 6, 2000 hearing in Bankruptcy Court, Judge Walsh found that the dispute was resolvable upon consideration of the first, contractual, inquiry. He stated that "Schlumberger knowingly explicitly excluded [the BCN royalties] from the agreement...." Nor was Judge Walsh persuaded by Schlumberger's second argument that it has superior rights to the royalties. He stated that "I think to now argue that notwithstanding the plain language of the documents that in some fashion the royalties have to follow the intellectual property is not at all persuasive to me."

Schlumberger disagrees with Judge Walsh's ruling that the plain language of the documents indicate that it "knowingly [and] explicitly excluded [the BCN royalties] from the agreement." According to Schlumberger, the Asset Purchase Agreement makes clear that CellNet assigned the intellectual property to Schlumberger, and nothing in that agreement suggests that the right to royalties was to be divorced from Schlumberger's ownership of that property. Schlumberger relies on precedent in this court holding that "[w]here an assignment conveys all the assignor's right, title and interest, if the right to receive royalties is to be severed from the beneficial ownership of the patent and remain in the assignor, there must be an express reservation or some agreement to that effect." *Crom v. Cement Gun Co.*, 46 F.Supp. 403, 405–06 (D.Del.1942); *see also Chemical Found. v. E.I. du Pont De Nemours & Co.*, 29 F.2d 597, 600 (D.Del. 1928). Schlumberger submits that "CellNet has never identified in the documents any express statements relinquishing Schlumberger's rights to royalties." Opening Br. at 7.

Judge Walsh's reading of the documents was well-supported. The Asset Purchase Agreement and the March 24 letter, taken together, unambiguously show that Schlumberger wished to exclude the License Agreements from its purchase. The March 24 letter specifically lists the License Agreements as "Excluded Contract[s]." Because the right to receive royalties arises only from those License Agreements, Schlumberger's exclusion of the License Agreements includes the right to receive royalties thereunder. Importantly, the March 24 letter does not parse the individual provisions of the License Agreements to designate which obligations Schlumberger intended to purchase. Instead, Schlumberger unambiguously refused all contracts relating to the BCN joint venture.[1] Thus, Schlumberger unam-

---

1. Although the record on appeal does not speak to why Schlumberger chose to exclude the License Agreements from its acquisition, the court notes that those agreements contain many other covenants other than a mere license in return for royalties. The License

biguously excluded the License Agreements and attendant royalty payments from BCN.[2]

Nor is there any ambiguity in the Asset Purchase Agreement or March 24 letter. Schlumberger has not attempted to identify an ambiguous provision in either document. Because the right to royalties arises only from the License Agreements, Schlumberger's exclusion of those agreements (and the royalties they set forth) was unambiguous and effective. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (N.Y.1990) ("A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

Schlumberger's second argument on appeal is that it has superior rights to the royalties as owner of the intellectual property and should therefore receive the BCN royalties. This argument is itself comprised of two propositions. The first is that CellNet has no rights to the BCN royalties because it rejected the License Agreements pursuant to § 365(a) of the Bankruptcy Code. The second is that Schlumberger should be entitled to the royalties because it, as owner of the intellectual property, bears the burden of BCN's continued use of the intellectual property.

Schlumberger's argument that CellNet rejected the License Agreements pursuant

to § 365(a) is inapposite. While it is true that a debtor-in-possession, such as CellNet, is not a party to pre-petition executory contracts that it rejects pursuant to § 365(a), *see In re Bildisco*, 682 F.2d 72 82–82 (3d Cir.1982); *In re Access Beyond Techs.*, 237 B.R. 32, 47 (Bankr.D.Del.1999), CellNet is not relying on the contractual obligations of the License Agreements as the source of its right to the royalties. Instead, CellNet argues that it is entitled to the royalties because BCN elected, pursuant to § 365(n) of the Bankruptcy Code, to enforce its licensure. And because § 365(n)(2) requires the licensee to continue to pay royalties to the licensor, CellNet submits that it is entitled to the BCN royalties.

 CellNet is correct that § 365(n) of the Bankruptcy Code renews certain obligations related to the license. Under § 365(n), when a licensee elects to retain its rights to the licensed property, the licensor may not interfere with the licensee's use of the technology and the licensee is required to "make all royalty payments due under such contract for the duration of such contract...." 11 U.S.C. § 365(n)(2)(A), (B). Schlumberger argues that § 365(n)(2) does not designate that the payment of royalties must be made to any particular party, and therefore the court should conclude that the royalties should be paid to it, as the owner of the intellectual property. However, Schlumberger has not produced, and the court is

Agreements also obligated the licensor to update the covered technology and provide consulting and support services.

**2.** Schlumberger's reliance on *Crom* and *Chemical Foundation* is not persuasive. The "express reservation" requirement in *Crom* and *Chemical Foundation* is not a special requirement for the assignment of intellectual property. The passages of both cases relied upon by Schlumberger only recite the general

proposition that assignment of a patent is governed by principles of contract law and that the agreement of the parties should be given effect. *See May v. Saginaw County*, 32 F. 629 (C.C.E.D.Mich.1887) ("This assignment [of a patent] is a contract, and like all other contracts is to be construed so as to carry out the intention of the parties to it.") (cited in *Chemical Found.*, 29 F.2d at 600).

unaware of, any authority interpreting § 365(n) to require that royalty payments be made to the owner of the intellectual property as a matter of law. Rather, § 365(n)(2)(B) states that "the licensee shall make all royalty payments due under such contract...." 11 U.S.C. § 365(n)(2)(B). Without considering the legislative history of this provision, it appears that Congress intended the language "due under the contract" to provide both the quantity of the royalty payments and the designation of the party intended to receive those payments, whether the debtor or its contractual assignee. Under the License Agreements, the royalty payments were to be made to CellNet. Because Schlumberger refused to acquire those License Agreements, under § 365(n)(2)(B) CellNet remains entitled to receive the BCN royalties pursuant to statutory authority even if it rejected the License Agreements and is not technically a party to them.

■ Therefore, royalty payments made pursuant to § 365(n)(2)(B) of the Bankruptcy Code are the property of the licensor, even though the licensor may have transferred its intellectual property assets during the bankruptcy. During argument, Schlumberger noted that it was unaware of any prior authority on this issue and that it believed that CellNet's rejection of the License Agreement under § 365(a) terminated any rights CellNet might have had to the royalties. It is clear, however, that New York law does not permit Schlumberger to seek relief based on a mistake of law when the contract otherwise represents the parties' intentions. "Where the parties have made an instrument as they intended it should be, and the instrument expresses the transaction as it was understood and designed to be made, then the party who had an opportunity to know the contents of the instru-

ment cannot obtain cancellation or reformation because he misunderstood the legal effect of the whole or of any of its provisions." *Jossel v. Meyers*, 212 A.D.2d 55, 629 N.Y.S.2d 9, 10–11 (N.Y.App.Div.1995); *see also Gimbel Bros. v. Brook Shopping Ctrs.*, 118 A.D.2d 532, 499 N.Y.S.2d 435, 439 (N.Y.App.Div.1986) (a party is not entitled to restitution when that party displayed "a marked lack of diligence in determining what its contractual rights were").

The Asset Purchase Agreement and March 24 letter contain no ambiguities and, by those documents, Schlumberger excluded the License Agreements from the assets it was acquiring. While Schlumberger has argued that, under this pattern of events, it is entitled to receive the royalties from BCN, either as a matter of contract law or under the Bankruptcy Code, both parties agree the Asset Purchase Agreement and March 24 letter accurately represent the parties' intentions. Thus, it is only the legal effect of the transaction that Schlumberger challenges. Because the Bankruptcy Court properly held that BCN's royalty payments are the property of the CellNet as the licensor, the court will affirm its judgment.

## III. *CONCLUSION*

The Bankruptcy Court correctly determined that CellNet was the owner of the royalties paid by BCN following CellNet's sale of the underlying intellectual property to Schlumberger. Because Schlumberger excluded the License Agreements under which the royalties were paid, the right to receive those royalties remained with CellNet. Furthermore, neither CellNet's rejection of the License Agreements under § 365(a), nor BCN's decision to enforce its license under § 365(n), acts to transfer that entitlement of royalties to Schlumberger. The judgment of the Bankruptcy

Court is hereby affirmed and the court will enter an order consistent with this ruling.