

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-30-2003

# In Re: Cellnet Data

Precedential or Non-Precedential: Precedential

Docket 02-2546

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re: Cellnet Data " (2003). *2003 Decisions.* Paper 574.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/574

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 30, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2546

IN RE: CELLNET DATA SYSTEMS, INC.,

Debtor

SCHLUMBERGER RESOURCE
MANAGEMENT SERVICES, INC.,

Appellant

v.

CELLNET DATA SYSTEMS, INC.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. No. 01-cv-00008)
District Judge: The Honorable Roderick R. McKelvie

Argued December 16, 2002

BEFORE: NYGAARD, ALITO, and RENDELL,
*Circuit Judges.*

(Filed April 30, 2003)

Mary Grace Diehl, Esq. (Argued)
Troutman Sanders
600 Peachtree Street, N.E.,
 Suite 5200
Atlanta, GA 30308
  *Counsel for Appellant*

John H. Knight, Esq.
Mark D. Collins, Esq.
Richards, Layton & Finger
One Rodney Square, P.O. Box 551
Wilmington, DE 19899

Mark J. Thompson, Esq. (Argued)
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
    *Counsel for Appellee*

## OPINION OF THE COURT

NYGAARD, *Circuit Judge.*

This appeal presents us with an issue of first impression involving elections under 11 U.S.C. § 365(n). CellNet Data Systems, Inc. sold its intellectual property to Schlumberger Resource Management Services, Inc., which specifically excluded the assets and liabilities of certain licensing agreements under the terms of the sale. After CellNet rejected those licensing agreements under 11 U.S.C. § 365(a) of the bankruptcy code, the licensee exercised its rights under § 365(n) to continue to use the intellectual property, subject to the royalty payments due under the original license. Both CellNet, as party to the contract, and Schlumberger, as holder of the intellectual property, claim the right to receive the royalty payments. The District Court determined that Schlumberger had expressly severed the royalties from the intellectual property by the terms of the purchase agreement and that the royalties remained in CellNet's estate. Although CellNet then rejected the license, the licensee, by operation of § 365(n), elected to enforce the license and thus the District Court concluded that the royalties due under the revived contract belonged to CellNet. We will affirm.

### I. Jurisdiction and Standard of Review

The Bankruptcy Court had subject matter jurisdiction over the initial proceedings pursuant to 28 U.S.C.

§ 1334(b). The District Court's jurisdiction for the bankruptcy appeal is found in 28 U.S.C. § 158(a)(1). Our jurisdiction over this appeal arises from 28 U.S.C. § 158(d). We exercise plenary review of an order issued by a district court sitting as an appellate court in review of the bankruptcy court. *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 125 (3d Cir. 2000). Pursuant to Rule 8013 of the Federal Rules of Bankruptcy Procedure, on appeal, findings of fact by the bankruptcy court are set aside if clearly erroneous. A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). We review legal conclusions *de novo* and mixed questions of law and fact under a mixed standard, affording a clearly erroneous standard to integral facts, but exercising plenary review of the lower court's interpretation and application of those facts to legal precepts. *In re Top Grade Sausage, Inc.*, 227 F.3d at 125.

## II. Background

The essential facts are not in dispute, rather how those facts operate is at issue. In 1997, CellNet, a developer of a wireless data network for meter reading, now in bankruptcy, entered into a joint venture with Bechtel Enterprises, Inc., forming a company called BCN Data Systems LLC. As part of the joint venture, CellNet entered into several licensing agreements with BCN, that provided BCN with an exclusive license to use CellNet's intellectual property outside the United States. In return, CellNet received a royalty payment equal to three percent of BCN's gross revenues. The License Agreements also contained a covenant that CellNet would provide technological support to BCN during the lifetime of the Agreements.

Three years later, with CellNet on the verge of bankruptcy, Appellant, Schlumberger, proposed the sale of CellNet's assets. Schlumberger and CellNet entered into a Proposal Letter under which Schlumberger would purchase "all or substantially all of the assets and business operations of [CellNet] and its subsidiaries." The January 31, 2000 Proposal Letter also provided that Schlumberger

"would acquire all assets of [CellNet] free and clear of all liens other than certain liens to be agreed (the 'Assets'), other than the Excluded Assets (as defined below), used in, held for use in, or related to the business and operations of [CellNet]." Thus, the proposal contemplated that certain assets of CellNet would not be subject to the ultimate purchase agreement. However, the term "Excluded Assets" was left open for future agreement by the parties.

CellNet filed for bankruptcy on February 4, 2000. On March 1, 2000, Schlumberger and CellNet entered into an Asset Purchase Agreement that mirrored the intent of the Proposal Letter, in that Schlumberger would purchase all of CellNet's assets, subject only to certain excluded assets. This time, however, the agreement included language that explained:

> At any time prior to March 25, 2000, [Schlumberger] shall be entitled unilaterally to amend this Agreement, including without limitation Schedules 1.01(a)(i) (Stock Acquired), 1.01(b) (Excluded Contracts) and 1.01(e) (Excluded Assets) attached hereto, solely for the purpose of excluding any or all of the stock, assets, liabilities and agreements of [CellNet] pertaining to [CellNet's] joint venture with Bechtel Enterprises, Inc., or its affiliates, (collectively, the "BCN Assets and Liabilities") from the stock, assets, liabilities and agreements being acquired or assumed by [Schlumberger] hereunder.

Thus, the Purchase Agreement provided that Schlumberger would purchase all of CellNet's intellectual property, etc., but would be able to specifically exclude all stocks, assets, liabilities, and agreements pertaining to CellNet's venture with BCN.[1] Pursuant to a letter by counsel on March 24, 2000, Schlumberger elected to exercise its right to exclude the BCN assets and liabilities. The letter went on to specifically designate the License Agreements between CellNet and BCN as assets and liabilities excluded from the purchase under the heading "Excluded Contracts."

---

1. The contract also contained an integration clause and a provision stating that disputes over the agreement would be governed by New York law.

Despite excluding the License Agreements, Schlumberger asserted a right to the royalties under the Agreements prior to the approval of the Asset Purchase Agreement by the bankruptcy court. This was based on the belief that CellNet would have to reject the Agreements under § 365(a) as executory contracts that it could not fulfill and that Schlumberger would then be entitled to the royalties as owner of the underlying intellectual property. CellNet believed otherwise, but in an effort to complete the sale of its assets, agreed to reject the License Agreements and preserve the right of the parties to contest ownership of the royalties. The parties memorialized the decision to reject the License Agreements under § 365(a) in an additional section of the Asset Purchase Agreement. The new section read:

> [Schlumberger] has elected not to assume the License and Consulting Services Agreement between [CellNet] and BCN Data Systems, L.L.C. ("BCN"), dated January 1, 1997, the [OCDB License Agreement] between [CellNet] and BCN dated January 1, 1997 . . . (collectively, the "BCN License Agreements"). [CellNet] shall obtain an order from the Bankruptcy Court pursuant to Section 365(a) of the Bankruptcy Code rejecting the BCN License Agreements. The parties hereto acknowledge that if BCN elects to retain its rights under the BCN License Agreements in accordance with Section 365(n)(1)(B) of the Bankruptcy Code, then the rights and obligations of the parties with respect to the License Agreements, including without limitation any royalty rights thereunder, are disputed by the parties. Each party reserves all rights under this Agreement with respect to the BCN License Agreements, and neither this Amendment nor any action taken in connection herewith, including the filing of any modified Sale Order, shall be deemed to be a waiver or admission of any matter related to the dispute between [CellNet] and [Schlumberger] regarding the BCN License Agreements.

Under this agreement, CellNet agreed to reject the License Agreements pursuant to § 365(a), but both parties acknowledged that a dispute over royalties would remain if

BCN elected to retain its rights under § 365(n). On May 4, 2001, the Bankruptcy Court approved the Asset Purchase Agreement with both the addition, as well as additional language that further expressed that the sale did not alter the rights of CellNet, Schlumberger, or BCN regarding the License Agreements and the royalties due thereunder.

Following approval of the sale, CellNet moved to reject the License Agreements under § 365(a). Section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). CellNet was permitted to act as the trustee because it was a debtor-in-possession pursuant to 11 U.S.C. § 1107(a). The Bankruptcy Court approved the motion and CellNet informed BCN of its election. BCN, in turn, chose to retain its rights under § 365(n). Section 365(n) provides that "[i]f a trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect" to either terminate the contract or retain certain rights under the license. Specifically, the licensee may elect:

> to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable non-bankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property . . . as such rights existed immediately before the case commenced. . . .

11 U.S.C. § 365(n)(1)(B). If a licensee elects to retain its rights, section 365(n)(2)(B) of the Code requires it to "make all royalty payments due under such contract for the duration of such contract. . . ." By its election, and operation of § 365(n), BCN was permitted to continue to use the intellectual property originally licensed from CellNet, but was required to pay the royalties due under that license.

Rather than remain in a joint venture, CellNet and Bechtel agreed that Bechtel would acquire all of the assets and liabilities of BCN and make one lump sum payment to

CellNet that would encompass the future royalty payments due under the License Agreements. The Bankruptcy Court approved the sale to Bechtel, and the negotiated amount of $2,250,000 for the future royalties was placed in escrow pending resolution of who was entitled to the royalties.

Both the Bankruptcy Court and the District Court found that CellNet was entitled to the royalties. In its opinion, the District Court addressed the same arguments now raised before us. Schlumberger argued that the Asset Purchase Agreement and its later rejection of the License Agreement did not operate to separate the right to the royalties from the underlying ownership of the intellectual property. Alternatively, Schlumberger asked the District Court to look past the original exclusion and find that because it owns the intellectual property and CellNet subsequently rejected the license under § 365(a), it has superior rights to the royalties.

In affirming the decision of the Bankruptcy Court in favor of CellNet, the District Court thoroughly analyzed the Asset Purchase Agreement and subsequent exclusion of License Agreements. After finding that the Purchase Agreement was not ambiguous, the District Court looked at the "express reservation" requirement necessary for the separation of royalties from intellectual property and decided that the Purchase Agreement could only be interpreted to separate the royalties due under the license from the intellectual property. The District Court also addressed Schlumberger's contention that it had superior rights under § 365 because it owned the intellectual property and CellNet had rejected the license pursuant to § 365(a). The District Court agreed with CellNet that the election of BCN pursuant to § 365(n) renewed certain obligations related to the license. The District Court found that under the License Agreements, the royalty payments were due to CellNet and that because Schlumberger had excluded those License Agreements from its purchase, CellNet "remains entitled to receive the BCN royalties pursuant to statutory authority even if it rejected the License Agreements and is not technically a party to them." *In Re CellNet Data Systems, Inc.*, 277 B.R. 588, 595 (D. Del. 2002).

### III. Discussion

A. The Effects of the Asset Purchase Agreement:

Schlumberger's first argument is that the Purchase Agreement and letter of March 2000 did not operate to sever the royalties from ownership of the intellectual property. Both the Bankruptcy Court and District Court disagreed and found that Schlumberger had separated ownership from its rights by the plain language of the Purchase Agreement and March Letter Amendment. These findings are clearly correct.

On appeal, Schlumberger points to two cases from the bankruptcy court that would require an express reservation to separate the components. In *Chemical Foundation, Inc. v. E.I. Du Pont De Nemours & Co.*, 29 F.2d 597 (D. Del. 1928) the court discussed the effects of assigning a patent on the right to receive royalties for that patent:

> Yet, as an assignment of a patent, without more, does not transfer to the assignee the right to recover damages or profits for prior infringements, although royalties to accrue and damages and profits for future infringements are incident to and accompany the patent unless separated by express reservation, and as a patentee may after assigning the patents sue and recover for past infringements, it would seem obvious that an assignor of a patent would have like rights with respect to royalties accrued at the time of the assignment. But the right to recover accrued royalties or damages and profits for past infringements may likewise be assigned.

*Id.* at 600 (citations omitted). *Chemical* espouses the proposition that royalties were inherent in ownership of a patent and flowed accordingly, although they could be divorced by an express reservation. This idea was expanded in *Crom v. Cement Gun Co.*, 46 F. Supp. 403 (D. Del. 1942), where the court discussed the ownership of a patent. After quoting much of the above language in *Chemical*, the court found that:

> Where an assignment conveys all the assignor's right, title and interest, if the right to receive royalties is to be

severed from the beneficial ownership of the patent and remain in the assignor, *there must be an express reservation or some agreement to that effect.* I do not think that the mere retention of the 'license'... is sufficient to make the severance, particularly where, as in the present case, it is merely for the purpose of protecting a supposed but nonexistent shop right and is in contravention of the understanding of the parties.

*Id.* at 405-06 (emphasis added).

Unlike the cases Schlumberger cites, the unambiguous Purchase Agreement and March Letter Amendment present here did expressly sever the royalties. This conclusion has support in a straightforward reading of the documents. The Purchase Agreement permitted Schlumberger "unilaterally to amend this Agreement...solely for the purpose of excluding any or all of the stock, assets, liabilities and agreements of [CellNet] pertaining to [CellNet's] joint venture with Bechtel Enterprises, Inc." Beyond this language, the Purchase Agreement also explained that "[n]otwithstanding anything herein to the contrary, the Purchaser shall not purchase or acquire, and shall have no rights or liabilities with respect to, any Excluded Asset." The Purchase Agreement further defined "Excluded Assets" to include "all rights of the Sellers under any Excluded Asset" and "all proceeds from any Excluded Asset."

These sections must be read in concert with the March 24, 2000 Letter, which sought to specify those items excluded from the Purchase Agreement. In that letter, Schlumberger "elect[ed] to amend the Asset Purchase Agreement to exclude the BCN Assets and Liabilities from the stock, assets, liabilities and agreements of the Sellers being acquired or assumed under the Asset Purchase Agreement." The letter went on to specifically enumerate the various License Agreements between CellNet and BCN as excluded assets. Thus, Schlumberger expressly sought to exclude all rights and liabilities under the License Agreements, including its rights to all proceeds under those Agreements.

Schlumberger now attempts to argue that the Purchase Agreement and March Letter (both of which it drafted) are

ambiguous and that extrinsic evidence is necessary to decide whether the Purchase Agreement contemplated severance of the royalties. This argument is unpersuasive. As the District Court correctly noted:

> The Asset Purchase Agreement and March 24 letter contain no ambiguities and, by those documents, Schlumberger excluded the License Agreements from the assets it was acquiring. While Schlumberger has argued that, under this pattern of events, it is entitled to receive the royalties from BCN, either as a matter of contract law or under the Bankruptcy Code, both parties agree the Asset Purchase Agreement and March 24 letter accurately represent the parties' intentions. Thus, it is only the legal effect of the transaction that Schlumberger challenges.

*In Re CellNet*, 277 B.R. at 595. Under New York law, "ambiguity does not exist 'simply because the parties urge different interpretations.'" *Hugo Boss Fashions v. Federal Insurance Co.*, 252 F.3d 608, 616 (2d Cir. 2001). When Schlumberger elected to exclude "all the proceeds from [the BCN License Agreements]" it expressly excluded the royalties from these agreements from the intellectual property it was purchasing. The effect of this exclusion is that the License Agreements remain in CellNet's estate.

Schlumberger also finds fault with the District Court's holding that "[b]ecause the right to royalties arises only from the License Agreements, Schlumberger's exclusion of those agreements (and the royalties they set forth) was unambiguous and effective." *In Re CellNet*, 277 B.R. at 594. Instead, Schlumberger argues that the right to the royalties derives from ownership of the intellectual property and not from the License Agreements. As a general proposition, Schlumberger is correct that it is the intellectual property that creates the right to royalties—as an owner may parcel out its "bundle of rights." However, this argument does not alter our analysis under these factual circumstances. At the time the License Agreements were created, CellNet owned the intellectual property and thus could license the right of exclusivity outside the United States to BCN in exchange for royalties. This separation of rights from the "bundle" was memorialized in the License Agreements. When

Schlumberger purchased the intellectual property owned by CellNet, the license already existed and, pursuant to § 365(n), would likely continue to exist. Based on Schlumberger's acceptance that they would be purchasing CellNet's intellectual property subject to BCN's rights,[2] and that BCN's rights existed solely from the excluded licenses, what Schlumberger bought was less than the full "bundle of rights" associated with ownership.

Thus, the initial right to royalties arose from the ownership of the intellectual property, but after Schlumberger elected to exclude the License Agreements, it severed those rights from the bundle it was purchasing. Once the royalties were divorced from the intellectual property, the only authority for their existence was the License Agreement. Because Schlumberger had excluded the Agreements, CellNet remained a party to those Agreements and would be entitled to the royalties thereunder.

Finding that CellNet would be otherwise rightfully entitled to the royalties once Schlumberger separated the royalties from the intellectual property that it purchased, we now turn to the question of how CellNet's rejection of the License Agreements under 11 U.S.C. § 365(a) and BCN's subsequent revival under § 365(n) affects the rights of the parties.

---

2. The Bankruptcy Court had to modify the Proposed Sale Order to account for BCN's interest in the sale. Originally, Schlumberger sought to "acquire all assets of [CellNet] free and clear of all liens other than certain liens to be agreed." This was modified by the Bankruptcy Court to account for BCN's rights under § 365(n) and the ultimate Sale Order approved reflected that Schlumberger could not acquire CellNet's assets free and clear of BCN's right to continue to use the licensed intellectual property. The Purchase Agreement defines the Sale Order as "an order of the Bankruptcy Court, in substantially the form attached hereto as Exhibit 1.01(d) and other in form and substance satisfactory to the Purchaser." Thus by closing on the sale, Schlumberger accepted the condition placed on it by the modified order, acknowledging that BCN's rights could interfere with its rights in the intellectual property.

B. After the 11 U.S.C. § 365(n) Election, Who is Entitled to the Royalties?

Under the Bankruptcy Code, a trustee may elect to reject or assume its obligations under an executory contract. This election is an all-or-nothing proposition—either the whole contract is assumed or the entire contract is rejected. 11 U.S.C. § 365(a). Pursuant to its Purchase Agreement with Schlumberger, CellNet, as trustee, rejected the License Agreements under 365(a). Normally in bankruptcy, this would end the obligations between the contracting parties and relegate the non-breaching party to an unsecured creditor. *See In Re Trans World Airlines*, 145 F.3d 124, 136 (3d Cir. 1998) ("If the lease is rejected, a creditor's claim for the stream of future rental payments due under the now-rejected lease is denied post-petition administrative status and is treated as an unsecured prepetition claim"). Congress, however, altered this system by passing an amendment that added § 365(n). Section 365(n) only applies to intellectual property and grants the licensee of intellectual property certain rights not enjoyed by other contracting parties. Specifically, if a trustee rejects an executory contract under § 365(a), the licensee of intellectual property may elect either:

> (A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

> (B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—

>> (i) the duration of such contract; and

> (ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

11 U.S.C. § 365(n)(1)(A)-(B).

Looking to the facts before us, Schlumberger excluded the License Agreements from its purchase, and then CellNet rejected the Agreements under § 365(a). In turn, BCN elected to retain its rights and was thus obligated to "make all royalty payments due under such contract for the duration of such contract." 11 U.S.C. § 365(n)(2)(B). Schlumberger argues that because CellNet rejected the contract, it has not assumed the benefits of the contract and thus has no rights under the contract. Schlumberger then posits that because it owns the underlying intellectual property, it has superior rights to the royalties—despite not purchasing the License Agreements. We disagree.

The District Court found that CellNet was entitled to the royalties because "§ 365(n) of the Bankruptcy Code renews certain obligations related to the license." *In Re CellNet*, 277 B.R. at 594. Despite Schlumberger's argument that because "§ 365(n)(2) does not designate that the payment of royalties must be made to any particular party," it should be entitled to the royalties, the District Court focused instead on the language stating that the "licensee shall make all royalty payments due under such contract." *Id.* at 594-95. The District Court concluded "that Congress intended the language 'due under the contract' to provide both the quantity of the royalty payments and the designation of the party intended to receive those payments, whether the debtor or its contractual assignee." *Id.* at 595. Because Schlumberger excluded the contract from its purchase, "CellNet remains entitled to receive the BCN royalties pursuant to statutory authority even if it rejected the License Agreements and is not technically a party to them." *Id.* The District Court concluded that "royalty payments made pursuant to § 365(n)(2)(B) of the Bankruptcy Code are the property of the licensor, even though the licensor may have transferred its intellectual property assets during the bankruptcy." *Id.*

Schlumberger makes essentially three arguments related to the effects of § 365(n). First, Schlumberger claims that

CellNet has no rights because it rejected the contract under § 365(a). To support this conclusion, Schlumberger cites our opinion in *In Re Bildisco*, 682 F.2d 72, 82 (3d Cir. 1982), where we held that "as a matter of law, a debtor-in-possession is '[a] new entity . . . created with its own rights and duties, subject to the supervision of the bankruptcy court.'" Schlumberger claims that this demonstrates that the License Agreements were not part of the estate because they were never assumed by CellNet as debtor-in-possession. Schlumberger is incorrect. In *NLRB v. Bildisco*, 465 U.S. 513 (1984), the Supreme Court affirmed our previously cited opinion. The Court, however, stated that:

> Obviously if the [debtor-in-possession] were a wholly 'new entity,' it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing.

*Id.* at 528. This implies that the License Agreements were property of the bankruptcy estate after Schlumberger excluded them and before CellNet rejected them. Schlumberger contends that the act of rejection serves to remove the contract from the bankruptcy estate and points to *In Re Access Beyond Technologies, Inc.*, 237 B.R. 32, 47 (D. Del. 1999), for the proposition that "[a]n executory contract does not become an asset of the estate until it is assumed pursuant to § 365(a) of the Code." That case however, is factually distinguishable from ours. In *Access*, the debtor attempted to assign its rights under a patent cross-license agreement. The debtor characterized the transaction as a sale under 11 U.S.C. § 363, but the court held that the debtor must first assume the agreement in order to transfer it. The court noted that otherwise, "[i]f the debtor does not assume an executory contract, it is deemed rejected. Thus, if a debtor does not assume an executory contract before he sells it . . . , the buyer may be

purchasing an illusion: the executory contract will disappear on conclusion of the bankruptcy case." *Id.* at 47-48. *Access* did not deal with our situation, which involves an executory contract *after* an election by a licensee under § 365(n). We need not specify the exact status of the contract. For our purposes it is suffice to say that after a licensee has resorted to § 365(n), the *rights* of the contract as they existed pre-petition and pre-rejection are in force.

The plain language of § 365(n)(2)(B) indicates that the renewed royalties are directly linked to the rejected contract, not the intellectual property. The section specifically provides that the "licensee shall make all royalty payments due *under such contract* for the duration *of such contract.*" 11 U.S.C. § 365(n)(2)(B)(emphasis added). Thus, the contract is the primary mechanism for determining where the royalties flow. Although Schlumberger is correct that § 365 (n)(2)(B) does not specify that the royalties must be paid to the trustee, the immediately proceeding section says that "trustee shall allow the licensee to exercise such rights," and the next section deals with the rights of the licensee against the trustee. 11 U.S.C. § 365(n)(2)(A), (C). The several sections of § 365(n)(2) make sense only in contemplation of an ongoing relationship between the licensee and the licensor/trustee.

Schlumberger next argues that the legislative history of § 365(n) favors awarding it the royalties. It notes that the legislative history of § 365(n) explains that the subsection parallels § 365(h), which deals with real estate and allows a similar retention of rights by holders of real estate leases. *See* S. Rep. 100-505, 1988 U.S.C.C.A.N. 3200, 3203 ("The bill provides for treatment of intellectual property licenses under Section 365 in a manner that parallels generally the treatment of real estate leases in the existing provisions of Section 365(h)(1)."). With this link in place, Schlumberger analogizes that its position in this case would be the equivalent of where a purchaser bought a shopping center, but did not assume the lease of an occupying tenant. Under § 365(h), the tenant could choose to remain in possession and pay rent, but the rent would belong to the new owner. According to Schlumberger, the position taken by CellNet and the District Court would alter the above situation and

provide that the tenant could still remain in possession, but would pay rent to the former owner of the shopping center.

Although this analogy is powerful, and the logic deceptively simple, Schlumberger's reasoning is specious because it rests on a flawed comparison of the parties. Although both sections of the Bankruptcy Code discuss their respective elections as being limited by non-bankruptcy law, the concept of tenants remaining in possession when a new landlord gains control is fraught with state law property principles not applicable in the intellectual property context. We find that there is no relationship between Schlumberger and the License Agreements—which it specifically did not purchase—that can be equated with the relationship of possessory control by a new landlord over a tenant remaining in possession.

Schlumberger's final argument is that the long-standing principle that the benefits of a contract should accompany the burden dictates that they should retain the royalties. Its argument, however, is trumped by the facts. It is true that the burden of the License Agreements falls on Schlumberger, who cannot use the intellectual property outside the United States and that the benefit to that burden is the royalty payments. However, state law allows the severance of the benefit from the burden and Schlumberger has done just that by excluding the License Agreement from its purchase and not contracting with CellNet for the royalties.

## IV. Conclusion

We will affirm the decision of the District Court. Schlumberger expressly excluded the License Agreement from its purchase of CellNet's intellectual property and thus severed the benefit of royalties from the associated burdens. Although CellNet rejected the License Agreements pursuant to 11 U.S.C. § 365(a), certain rights were renewed under the License Agreements by operation of BCN's § 365(n) election. If Schlumberger had wanted the royalties, they only needed to purchase the License Agreements or contract with CellNet for the royalties as part of the

Purchase Agreement. As they did neither, they are not entitled to the royalties from the BCN License Agreements.

A True Copy:
     Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*