

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-14-2005

# Brisbin v. Superior Valve Co

Precedential or Non-Precedential: Precedential

Docket No. 03-1793

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Brisbin v. Superior Valve Co" (2005). *2005 Decisions.* Paper 1507.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1507

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1793

KIRK BRISBIN,
d/b/a
Specialty Manufacturing

v.

SUPERIOR VALVE COMPANY;
SHERWOOD; HARSCO CORPORATION;
TAYLOR-WHARTON GAS EQUIPMENT
DIVISION

Harsco Corporation, Sherwood;
Taylor-Wharton Gas Equipment
Division,

Appellants

No. 03-1851

KIRK BRISBIN,
d/b/a Specialty Manufacturing,

Appellant

v.

SUPERIOR VALVE COMPANY;
SHERWOOD; HARSCO CORPORATION;
TAYLOR-WHARTON GAS EQUIPMENT
DIVISION

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 99-cv-01902)
Magistrate Judge: Honorable Francis X. Caiazza

Argued March 24, 2004

Before: ROTH, AMBRO, and CHERTOFF, <u>Circuit Judges</u>

(Opinion filed February 14, 2005)

Melissa H. Maxman, Esq.
Duane Morris
1650 Market Street
One Liberty Place, 37th Floor
Philadelphia, PA  19103-7396

Samuel Goldblatt, Esq.
Nixon Peabody LLP

1600 Main Place Tower
Buffalo, NY  14202

David H. Tennant, Esq. (Argued)
Nixon Peabody LLP
P.O. Box 31051
Clinton Square
Rochester, NY  14603

*Counsel for Appellants/Cross-Appellee*

George E. McGrann, Esq. (Argued)
Sarah E. Diedrich, Esq.
Schnader, Harrison, Segal & Lewis
120 Fifth Avenue
Fifth Avenue Place, Suite 2700
Pittsburgh, PA  15222

*Counsel for Appellee/Cross-Appellant*

————————

OPINION OF THE COURT

————————

AMBRO, <u>Circuit Judge</u>

This dispute arises out of a long-term supply relationship gone bad.  The plaintiff is Kirk Brisbin, an individual doing business as Specialty Manufacturing

("Specialty")[1]. Superior Valve Company ("Superior"), one of the named defendants, was acquired by defendant Harsco Corporation in the fall of 1998. After a bench trial, judgment ultimately was entered in favor of Specialty in the amount of $746,675. On appeal, we review the Magistrate Judge's conclusions regarding adequate assurance and damage issues. We affirm in part, reverse in part and remand for further proceedings.

## I. Factual Background and Procedural History

In 1997 Brisbin and Superior began negotiating long-term supply contracts whereby Specialty would sell Superior certain industrial goods. The result was two separate contracts in May 1998.[2] The first was for the sale of brass valves (hereinafter referred to as the "1065 valves"). The second contract was for the sale of two-inch, three-inch, four-inch and five-inch brass shell castings (hereinafter referred to generally as "shells").

---

[1]Thus this opinion refers to Brisbin and Specialty interchangeably.

[2] Specialty also alleges the existence of a third contract for the production of an item referred to as in-line valves. As this issue is unrelated to the other issues on appeal, the underlying facts are discussed separately in Part III.C. below.

4

The performance of both contracts was subject to certain quality control standards. Before Specialty could manufacture either the 1065 valves or any of the shells on a full-time basis, it had to receive approval from Superior. The initial step in the approval process was known as First Article Inspection ("FAI"). Stated briefly, FAI would test whether the material and dimensions of the item met requirements. Upon FAI approval, Specialty would begin a trial-production run of 100 pieces. Superior would then conduct tests to evaluate the consistency of the pieces. Only after Superior's approval of the samples from the trial-production run could Specialty begin full-time production.

According to a memorandum written by Ed Wingenroth, Superior's Director of Quality Assurance, Superior gave FAI approval to Specialty for the 3" shells on January 25, 1999. Superior then ordered a 100-piece trial-production run. Specialty completed the order in March. But because the shells were manufactured in South Korea,[3] Superior did not receive them until the beginning of June. Brisbin testified that Wingenroth tested the trial-production shells in April (in South Korea) prior to shipment. Superior,

_____

[3] Specialty is not a manufacturing company. Its primary value consisted of Brisbin's relationship with several South Korean manufacturers. With Superior's express permission, Specialty subcontracted the actual production of the 1065 valves and the shells.

however, conducted additional testing in late July. Several Superior employees testified that this testing uncovered problems with the bronze alloy with which the shells were made.

For the 1065 valves, Wingenroth gave FAI approval in a letter written May 27, 1999. Superior claims that it never authorized Wingenroth to give FAI approval because the valve samples did not meet testing requirements. Yet Superior asked Specialty to begin the 100-piece trial-production run for the 1065 valves in early June.

Specialty could not complete this trial-production run. According to Brisbin, his South Korean manufacturers were unable to source six of the required component parts for the 1065 valves. In a June 21 letter, Brisbin formally requested that Superior supply these component parts. Superior previously had supplied a limited number of component parts, enabling Specialty to manufacture samples and thus facilitating the FAI approval process. Superior, however, decided not to supply the components for the trial-production run.[4] Specialty apparently was not informed of this decision.

Beginning in late June and continuing through July,

_____

[4] The apparent reason for this decision was that, because Specialty was responsible for finding its own supplier for the components, testing would have to be redone.

Brisbin was frustrated with what he perceived as Superior's dilatory tactics.

> Well, I had spent over two years now of my time, considerable expense to my family, my business, and I was just not getting any direction . . . . At that point management clearly was not supporting the programs. I was having trouble having correspondence returned . . . . As of June, I will say late June, there was just starting to become a total collapse of effort and support in showing good faith toward the programs.

The one person at Superior with whom Brisbin corresponded was Joe Kilmer, the Director of Purchasing. But Brisbin testified that, while Kilmer was helpful in the sense that he actually returned calls, he did not facilitate Brisbin's repeated attempts to get feedback on the 1065 valves and 3" shells projects.

At the end of July, Brisbin spoke with Kenneth Miller — Vice President and General Manager of a division of Harsco Corporation — concerning the projects' status. As a result, Brisbin and various Superior employees held a conference call on August 2. According to Brisbin, Superior told him for the first time that the FAI approvals for both the 3" shells and the 1065 valves were either missing or did not exist. He was also informed that Superior would require

7

additional testing.[5]  For the 1065 valves, a Superior engineer allegedly informed Brisbin on the call that the project was a low priority and would not receive any attention for several weeks.  Despite Brisbin's repeated requests, Superior never supplied Specialty with any of the test results for either the 1065 valves or the shells demonstrating product nonconformance or the specific requirements Specialty would have to meet in order to be reapproved.

Brisbin memorialized his frustrations with Superior in an August 5 fax to Miller.  It contained the following statements:

- Additionally, I am now hearing my programs have not passed first article inspections, when I have signed documents from your Quality Control Manager at the time saying they are . . . .

- I can not . . . continue to pour my money . . . into these programs, having never asked Superior Valve Company to pay one penny, if your employees are going to continue to deny, stall, fabricate, lose documents, lose samples, deny documents exist, issue

---

[5] It is unclear whether the "additional testing" meant retesting according to the previously established quality control standards or implementing additional standards and tests.  The distinction, however, does not affect the resolution of this case.

8

incorrect purchase orders, change requirements, etc.

- I require these three invoices be paid to me, and that I receive this check of $112,868 in its entirety, before the close of business on Thursday, 19 August 1999, in my office in Texas.

- I want very much for these programs to go forward, but I must have, after two years, your company come forward and finally illustrate its good faith and pay the tooling and molding costs in as much [sic] as they continue to find reason to stall these programs.

- I would certainly expect . . . some sort of preliminary agreement be signed by me agreeing with the reason the payment is being made, and to show clearly what my obligations are for this payment.

Brisbin received two responses to his August 5 fax. In an August 11 letter, Superior formally rescinded the FAI approvals given by Ed Wingenroth for the 3" shells and the 1065 valves. The letter informed Brisbin that "a review of inspection documents shows that some required tests were not performed, and some dimensions were in nonconformance to [e]ngineering specifications." In an August 12 fax, Miller accused Brisbin of "attempting to establish a breach of contract" and denied that Superior was obligated to make any payments, but suggested that the parties arrange another conference call.

9

As a result, another conference call took place on August 17. In a fax that same day, Brisbin wrote:

- I am certainly interested in these programs and only wish they move forward as originally intended.

- However, understand Specialty Manufacturing believes, and has overwhelming documentation to support, our belief, that our products have already been fully test[ed] and approved.

- If additional testing and approvals are now required by Superior Valve Company — I understand. If this is the case, however, Specialty Manufacturing needs these new requirements in writing, and as soon as possible, and would expect Superior Valve Company to [bear] the additional costs incurred by Specialty Manufacturing in complying with these new conditions.

- In view of the delays in moving forward . . .[,] I believe it is time for Superior Valve Company to now absorb these startup costs. As earlier stated to you, we request this immediately be discussed and agreed upon. I will discuss different options or arrangements than previously required, but this very importantly needs to be resolved, and soon.

Miller responded with a short fax to Brisbin disagreeing with

10

his characterization of the phone conversation.

On September 1, Brisbin faxed to Miller a final attempt to reconcile the situation. After summarizing the past communications between the two companies, Brisbin stated:

> If Superior Valve . . . has any last minute ideas which would allow these programs to move forward, I would certainly listen, as I always have. Up to this point, however, I have not seen an expressed interest for these programs['] forward movement by management . . . .

The only response to this fax was a September 8 letter by Irene Ratajczak, a "Senior Administrative Assistant" at Superior, declaring its intention to refer "this matter over to our legal department."

Brisbin subsequently filed suit in the Western District of Pennsylvania seeking damages for breach of contract. Specifically, he requested lost profits from the two written contracts and the purported oral contract. With the consent of the parties, the matter was assigned to a magistrate judge for trial.

After conducting a bench trial, the District Court's Chief Magistrate Judge entered judgment for Specialty in the amount of $758,875 (subsequently reduced to $746,675). He

concluded that Specialty possessed reasonable grounds for insecurity under § 2-609 of the Uniform Commercial Code and made reasonable requests for adequate assurance. The Magistrate Judge also held that Superior's failure to provide any assurance of future performance and its decision to disengage from the relationship materially breached the supply contracts.

For damages, the Magistrate Judge awarded Specialty its lost profits for the 1065 valves and shells contracts. He calculated profits for the 1065 valves on the basis of (1) three full years of production (2) at the original quantity estimate in the contract (3) at the profit rate of $2.15 per valve. He based profits for the shells contract on (1) five full years of production (2) for each model (*i.e.*, the 2" shells, the 3" shells, *et al.*) (3) at the quantities and prices listed in the attachment to the contract. Finally, the Magistrate Judge held that the evidence was insufficient to award lost profit damages for the in-line valves project, but awarded reliance damages instead.

Shortly thereafter, Superior filed a Federal Rule of Civil Procedure 52(b) motion to amend certain findings of fact and the damages award. In February 2003 the Magistrate Judge affirmed his findings and, with a small exception, the damages award. Upon submission of Specialty's calculations, however, the Magistrate Judge denied Specialty's request for prejudgment interest.

Both sides timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II. Standard of Review

We review findings of fact for clear error and exercise plenary review over conclusions of law or the application of legal precepts to the facts. In re Cellnet Data Sys., Inc., 327 F.3d 242, 244 (3d Cir. 2003). "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985).

## III. Analysis

Superior attacks the Magistrate Judge's conclusion that Specialty's grounds for insecurity and requests for adequate assurance were reasonable. It also challenges his damages calculation.

Specialty raises two issues on cross-appeal. First, it argues that lost profits, not just reliance damages, are

13

recoverable for the in-line valves project. Second, it claims it is entitled to prejudgment interest on the damages awarded in its favor.

We address each argument in turn.

**A. Insecurity and Adequate Assurance**

1. Applicable Legal Standards

We have found no Pennsylvania cases discussing whether a trial court's conclusions on adequate assurance under 13 Pa. Cons. Stat. § 2609 (U.C.C. § 2-609) are findings of fact or conclusions of law. Courts and commentary discussing § 2-609 have concluded that these issues are generally questions of fact, but may sometimes be decided as a matter of law. See U.C.C. § 2-609, cmts. 3, 4; BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 702 (2d Cir. 1993) ("It is generally a question of fact whether a buyer has reasonable grounds for insecurity under § 2-609. There are circumstances, however, where this issue may be resolved as a matter of law." (citations omitted)); AMF v. McDonald's Corp., 536 F.2d 1167, 1170 (7th Cir. 1976) ("Whether in a specific case a buyer has reasonable grounds for insecurity is a question of fact."); Trust Co. for USL, Inc. v. Wien Air Alaska, Inc., No. 96-15222, 1997 U.S. App. LEXIS 11958 at *3 (9th Cir. May 20, 1997) ("The district court found that 'while . . . what constitutes adequate grounds for insecurity is

14

often a factual question, conduct may be sufficiently extreme as to be capable of decision as a matter of law.' We agree.") Lance Int'l Ltd. v. Menominee Paper Co., No. 98-2229, 1999 U.S. Dist. LEXIS 10370 at *17 (E.D. Pa. July 9, 1999) ("[A] question of fact is presented as to whether the request for adequate assurances was proper and reasonable under the circumstances."); Personnel Data Sys. v. Grand Casinos, No. 97-4896, 1998 U.S. Dist. LEXIS 11587 at *17 (E.D. Pa. July 30, 1998) ("[A] demand for adequate assurances under the UCC presents an issue of fact that cannot be decided on summary judgment."). For a court of appeals sitting in review of a district court, the inquiry of whether conduct was so egregious (or, conversely, so innocuous) as to allow a conclusion on adequate assurance as a matter of law is functionally the same as whether a district court's finding of fact was clearly erroneous. As the cases cited above suggest, we may not overturn the Magistrate Judge's conclusions unless the evidence reasonably supports only one conclusion.

Turning to the merits, Pennsylvania's Uniform Commercial Code provides that when "reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance." 13 Pa. Cons. Stat. § 2609(a). Failure to provide such assurance within a "reasonable time not exceeding 30 days" constitutes repudiation of the contract. Id. § 2609(d).

15

What constitutes "reasonable" grounds and "adequate" assurance is to be defined by commercial, not legal, standards. Id. § 2609(b). Comment 3 to § 2-609 of the U.C.C. provides that the grounds for insecurity "need not arise from or be directly related to the contract in question," and Comment 4 states that "repeated delinquencies must be viewed as cumulative." Further, Comment 4 indicates that what constitutes adequate assurance will vary depending on the circumstances and that the requested assurance need not be due under the contract. "What constitutes 'adequate assurance' is to be determined by factual conditions; [a party] must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious." Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (quoting Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309-10 (5th Cir. 1985)).[6]

2. Analysis

On appeal, Superior challenges the Magistrate Judge's adequate assurance findings on three grounds: (1) Specialty could not be insecure because any project delays were its own fault, i.e., Specialty's inability to source the six internal

---

[6] Although Cinicola involved the interpretation of a federal bankruptcy statute, 11 U.S.C. § 365(b), the language of the statute borrows the concept of U.C.C. § 2-609.

16

components for the 1065 valves and the quality control problems with both the 3" shells and the 1065 valves; (2) Specialty's request for payment of $112,868 was unreasonable because no contractual right to this payment existed; and (3) the Magistrate Judge erroneously interpreted internal Superior documents and improperly relied on this evidence in making his findings. The Magistrate Judge's findings, however, are fully supported by the factual record.

As to Superior's first challenge, we agree with the Magistrate Judge that Specialty's ability to manufacture the 1065 valves and shells in accordance with Superior's quality control standards is irrelevant. This inquiry pertains to the damages calculation, but it has no bearing on whether, in August 1999, Specialty had reasonable grounds to feel insecure about Superior's commitment to these projects.

As detailed above, a variety of evidence supports the Magistrate Judge's decision that Specialty had reasonable grounds to feel insecure. The 100-piece trial-production run for the 3" shells had been delivered to Superior by the late spring of 1999. Even assuming there were problems with the brass alloy used to manufacture the shells, the additional testing by Superior did not begin until a month and a half after their arrival. As for to the 1065 valves, even assuming the FAI approval was unwarranted, the record indicates (and Superior does not dispute) that Wingenroth had authority to give this approval. As such, Brisbin's reliance on

17

Wingenroth's authority was reasonable. Superior's argument also ignores that it asked Specialty to start the 100-piece trial-production run with knowledge that testing had not been completed. And while Superior may not have been obligated to supply the six component parts for the valve, it should have informed Specialty of its decision not to do so.

By June 1999, over a year had gone by since the contracts had been signed. Yet Specialty had not begun full-time production on any item. The record also indicates that, despite numerous attempts, Brisbin received little to no feedback on the status of these projects for at least a month and a half. When he finally received feedback during the August 2 conference call, he was told for the first time that Superior had either never given certain approvals or had lost them and that it would require additional testing.[7] From Specialty's perspective, Superior reversed its position on the FAI approvals after two months of silence and without any explanation as to why. (Brisbin's repeated requests for the test results demonstrating noncompliance and the proper quality control protocols also went unanswered.) In this context, reasonable grounds existed for Specialty to feel insecure about Superior's commitment to the projects.

---

[7] It appears ironic that the August 2 conference call was initiated largely in response to Brisbin's repeated pleas for a status update on the projects. Absent his plea, we wonder when (or if) Superior would have informed Specialty of any problems.

The record also supports the Magistrate Judge's finding that Specialty's requests for adequate assurance of Superior's performance were reasonable. Admittedly, the tone of Brisbin's August 5 fax was strident and Specialty had no right under the contract to recover the $112,868 Brisbin demanded as one means of assuring Superior's performance.[8] But we analyze a request for adequate assurance in a practical way, and such a request need not be tied to a contractual right. See U.C.C. § 2-609, cmts. 3, 4. In light of Superior's dilatory behavior and its reversal of position, Specialty had good cause to doubt Superior's commitment to the projects. Further, Specialty was in a vulnerable position because it could not begin recouping startup costs until Superior had given all approvals. As such, we conclude Specialty's decision to ask for assurance of Superior's performance in this manner was reasonable, notwithstanding the lack of a contractual right to demand or receive the $112,868.[9]

---

[8] The contract was structured so that startup costs were incorporated into the unit price of the items.

[9] Superior argues that Specialty was requesting payment of the $112,868 without any corresponding price concession — *i.e.*, to be paid twice for tooling and machinery costs. Brisbin's statements in the August 5 fax — that he "certainly" expected payment to be accompanied by an agreement detailing why "the payment is being made" and what his "obligations are for this payment" — indicate otherwise.

19

Further, Brisbin's August 17 fax indicates a willingness to entertain alternative forms of assurance in lieu of immediate payment of the $112,868. Even his September 1 letter demonstrates a continued interest in reaching an amicable solution. Despite these entreaties, Superior neither presented a single counterproposal nor gave any indication that it was willing and able to perform its obligations under the contract in good faith. Instead, Superior decided to cease all communications and referred the matter to its legal department.

Lastly, we turn to Superior's claim that the Magistrate Judge erroneously interpreted and improperly relied on internal Superior documents. The evidence in question was generated by Superior employees in August 1999, after the August 2 conference call. A handwritten note by Jon Carter, a purchasing manager for Superior, at an August 4 meeting states: "Create enough issues to eliminate the interest." Another handwritten note from this meeting, this time by Joe Kilmer (Superior's purchasing director), instructs: "Disengage/Discontinue." A third note, written by Kilmer on August 5, advises that the agreements signed by Superior were "not adequate" and needed "to be rewritten." Finally, an August 10 e-mail (this one by Bill Recktenwald, an employee in Superior's engineering department) states that, after additional testing, the 1065 valves and shells projects may not be "appealing . . . from a cost savings standpoint."

20

The Magistrate Judge relied on this evidence, in part, in concluding that Superior's severance of its relationship with Specialty "did not comport to standards of good faith and fair dealing." On appeal, Superior raises two objections. Concerning the Carter and Kilmer notes, Superior argues that they are ambiguous and that the Magistrate Judge interpreted them in a way contrary to both Carter and Kilmer's testimony. As for the documentary evidence, Superior claims that the Magistrate Judge's reliance on this evidence was improper because Specialty had no knowledge of these items at the time.

First, the decision finding not credible the testimony of Carter and Kilmer should be overruled only if clearly erroneous. See Anderson, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." (internal citation omitted)); Scully v. US WATS, Inc., 238 F.3d 497, 506 (3d Cir. 2001) (stating that the "credibility of witnesses is quintessentially the province of the trial court, not the appellate court" (internal citation omitted)); Palazzo v. Corio, 232 F.3d 38, 44 (2d Cir. 2000) ("The weighing of the evidence is a matter for the trier of fact, not the court of appeals, and the 'clearly erroneous' standard of review is a deferential one. The mere presence of evidence to support an

inference contrary to that drawn by the trier of fact does not mean that the factual findings were clearly erroneous."). As previously discussed, the evidence supports the conclusion that Superior was engaging in dilatory behavior. Therefore, the Magistrate Judge hardly erred in disregarding Carter and Kilmer's self-serving testimony and interpreting their handwritten notes as evidence of Superior's bad faith.

Further, the Magistrate Judge did not improperly rely on the documentary evidence to make adequate assurance findings. As Superior suggests, a § 2-609 analysis must be based on the facts and circumstances known at the time adequate assurance is requested. If a party had no knowledge of certain facts, it follows that the reason for insecurity (and the decision to ask for adequate assurance) was not based on those facts. But as previously discussed, Specialty's grounds for insecurity and requests for adequate assurance were reasonable based upon the information it had at the time. Such a conclusion does not depend on the documentary evidence to which Superior objects, and the Magistrate Judge did not rely on the evidence for this purpose. He merely cited this evidence to support an entirely separate conclusion — that Superior breached the contracts by failing to respond to the requests for adequate assurance and by disengaging from its relationship with Specialty.

22

**B. Lost Profits for the 1065 Valves and Shells Contracts**

The Magistrate Judge awarded Specialty lost profits for both the 1065 valves and shells contracts. Superior raises a number of challenges to this award on appeal. We agree that certain conclusions of the Magistrate Judge were in error, and we remand in order to afford him the opportunity to make additional findings based on the record made at the bench trial.

### 1. Applicable Legal Standards

Lost profits may be recovered under Pennsylvania law if (1) "there is . . . evidence to establish the damages with reasonable certainty," (2) the damages "were the proximate consequence of the wrong," and (3) the damages "were reasonably foreseeable." Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991) (citing Delahanty v. First Pa. Bank, N.A., 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983)). "Proof of damages need not be mathematically precise, but the evidence must establish the fact 'with a fair degree of probability.'" Id. at 680 (quoting Exton Drive-In, Inc. v. Home Indemnity Co., 261 A.2d 319, 324 (Pa. 1969)). Lost profits, however, "cannot be recovered where they are merely speculative," Delahanty, 464 A.2d at 1258, and Pennsylvania courts are reluctant to award them when a business venture is

not established.  <u>Id.</u> at 1258-59.[10]  A plaintiff bears the burden of establishing lost profits.  <u>Id.</u> at 1257.

### 2. Duration of the Contracts and Length of Production

To calculate lost profits, the Magistrate Judge multiplied the estimated profit for each individual item for a year of full-time production by the total length of the contract (*i.e.*, three years for the 1065 valves contract and five years for the shells contract).  But as of the date of Superior's breach (approximately fifteen months into the contracts), Specialty had not begun full-time production on either the 1065 valves or any of the shells.  Undeterred, the Magistrate Judge concluded that, under Pennsylvania law, it would be reasonable to extend the contracts beyond their expiration dates to allow Specialty to receive its "full expectation interest."  This decision to calculate damages on the basis of three and five years of full-time production erred as a matter of law.

In support of the Magistrate Judge's conclusion,

---

[10] Typically courts are reluctant to award lost profits to untested businesses because of the difficulty in estimating future sales.  Due to the quantity estimates and long-term nature of the contracts in this case, that is not a problem.  Yet Specialty faced its own uncertainty — its subcontractors had no prior experience manufacturing either the 1065 valves or the shells.

24

Specialty argues that, because development costs were incorporated into unit prices and would be recouped over the life of the contracts, they make economic sense only if they continue for three and five years of production. Yet this is not how they are written. The 1065 valves contract states that the "agreement is effective for a term beginning May 28, 1998, and ending May 27, 2001." The shells contract contains identical language, but expires on May 27, 2003. The contracts neither provide for development time nor guarantee a minimum period of full-time production. Sympathy aside, it is axiomatic that a court may not rewrite the clear provisions of a contract to make it more reasonable or to protect a party against an unwelcome result. See Sultan Chemists, Inc. v. EPA, 281 F.3d 73, 80 (3d Cir. 2002); State Farm Mut. Auto. Ins. Co. v. Coviello, 233 F.3d 710, 717 (3d Cir. 2000) (discussing Pennsylvania law); Selko v. Home Ins. Co., 139 F.3d 146, 151-52 (3d Cir. 1998) (same).

Even more damaging to Brisbin is that at trial he had the burden of producing evidence to establish the date full-time production would have begun for each project in order to recover lost profits for the valves and shells. Delahanty, 464 A.2d at 1258. This is obviously a difficult task inasmuch as Brisbin had to peg a date from seemingly indeterminate facts. We nonetheless remand to allow the Magistrate Judge the opportunity to make findings on this issue. He must do so solely based on the evidence presented at the bench trial, as Brisbin does not get a chance to supplement the record (his

25

opportunity having come and gone by the trial's end).  In any event, if the Magistrate Judge determines on remand that Brisbin established the date full-time production would have begun for each project, he may only recover lost profits for the valves and shells from that date through May 27, 2001 and May 27, 2003, respectively.

### 3. Failure to Source Component Parts for the 1065 Valves

Specialty did not establish that its subcontractor even was capable of manufacturing the 1065 valves.  Its contract with Superior states, and Specialty does not dispute, that it was required to supply "fully manufactured, assembled, and tested" 1065 valves.  The record also shows that Specialty's South Korean subcontractor never found a supplier for six of the roughly thirty component parts.

Specialty alleges that Superior agreed to supply these components in the fall of 1998.  But the only evidence of this is a single statement made by Brisbin.[11]  Neither a written contract nor other documentary evidence exists.  Even

[11] Brisbin testified on direct examination: "I believe there was a couple [of components] . . . that [the South Korean manufacturer was] not able to source at that time without a great deal of costs and time.  So Superior offered to supply approximately five or six of the internal components."

assuming Brisbin's testimony is credited, such an agreement would be unenforceable under the Statute of Frauds.  See 13 Pa. Cons. Stat. § 2201 (requiring an agreement for the sale of goods over $500 to be in writing).  Thus we do not know when, or even if, Specialty could have begun manufacturing the 1065 valves.  Again, this is an issue the Magistrate Judge is best qualified to resolve on remand.

### 4. Quality Control Problems with the 1065 Valves

In awarding lost profits, the Magistrate Judge did not consider whether the prototype 1065 valves supplied by Specialty satisfied Superior's quality control requirements. This should have been determined.  Whether the FAI approval was improperly given, while irrelevant to the adequate assurance inquiry, is relevant to damages.  To recover lost profits under Pennsylvania law, Specialty must establish to a reasonable certainty when and if the valves would meet specifications.  Advent Sys., 925 F.2d at 680.  Neither Specialty nor its subcontractor had experience manufacturing the valves, so we do not have a course of performance upon which to rely.   Therefore, Specialty had to present other evidence of substantial compliance with the contract requirements before lost profits could be recoverable.

The Magistrate Judge made no findings on the matter, stating in a footnote:  "It would be remiss for this court to fail to consider Superior Shell's responsibility to deliver a safe

27

product to market.  In that respect, the need to conduct further testing was not only reasonable but apparently necessary."  For Specialty to recover lost profits for the 1065 valves, on remand the Magistrate Judge must find that Speciality introduced evidence establishing when (if ever) the valves could have met Superior's quality control requirements (assuming Superior worked with Speciality in good faith).

## 5. Annual Quantity Term for the 1065 Valves

The Magistrate Judge also erred in calculating damages for the 1065 valves based on an annual production figure of 25,000 valves.   The contract states that Superior "agrees to purchase all of its requirements for Valves from Specialty."  Exhibit A to the contract states the "Annual Usage" is 25,000.  Yet this figure is an estimate of expected requirements, not a minimum takings obligation.  Under Pennsylvania law, the quantity term for a requirements contract is the "actual . . . requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate . . . may be tendered or demanded." 13 Pa. Cons. Stat. § 2306(a).  "In a requirements contract, '[t]he seller assumes the risk of all good faith variations in the buyer's requirements, even to the extent of a determination to discontinue the business.'"  U&W Indus. Supply, Inc. v. Martin Marietta Alumina, Inc., 34 F.3d 180, 188 (3d Cir. 1994) (citation omitted).  But a "buyer purchasing less than its forecasts may still be found in breach if it acted in bad faith."

28

Reilly Foam Corp. v. Rubbermaid Corp., 206 F. Supp. 2d 643, 657 (E.D. Pa. 2002) (citing James J. White & Robert S. Summers, Uniform Commercial Code § 3-9, at 141 (5th ed. 2000)).

Once again, the Magistrate Judge awarded lost profits without making the requisite findings. The uncontroverted testimony at trial was that Superior revised the annual estimate for 1065 valves downward from 25,000 to 8,000–10,000. While the Magistrate Judge concluded Superior acted in bad faith in canceling the contracts, no such finding was made regarding the downward estimate. Indeed, neither the Magistrate Judge nor the parties have even discussed the issue. This too should be addressed on remand.

### 6. Profits Lost on the Shells Contract

The Magistrate Judge erred in awarding lost profits for all of the shells when only the 3" shells had received FAI approval. The record indicates, and Specialty does not dispute, that separate FAI approvals were required for 2", 3", 4" and 5" shells. Prior to August 1999 Specialty had submitted no shell size for approval other than the 3" shells. In fact, Specialty missed a self-imposed deadline to provide sample 4" shells by late June 1999. Further, Brisbin testified that he initially anticipated between one and two years to get the subcontractors up to speed, receive necessary approvals and begin full-time production for all four shell sizes. While

the Magistrate Judge found that samples for the other shell sizes were being produced in August, there are no findings (and perhaps little to nothing in the record to allow findings) (1) when these samples would have been completed, (2) how long FAI approval should have taken, (3) how long a trial-production run and approval would have taken, and, ultimately, (4) when Specialty could have begun full-time production.

In addition, it is unclear whether the shells satisfied quality control requirements. As stated previously, Superior employees testified that additional testing uncovered problems with the brass alloy used for *all* shell sizes. Because this problem was common to all the shells, Superior argues that lost profits cannot be awarded. The Magistrate Judge noted, however, that a different Superior employee testified on cross-examination that the sample 3" shells actually passed the required tests. The Magistrate Judge concluded:

> On the basis of this record the court cannot make a finding that the samples provided by Specialty did not meet the applicable standards and the quality requirements of Superior Valve. Parenthetically, the court need not and will not proceed onto a protracted analysis of that question because it found that Superior Valve had materially breached the contract . . . and because it failed to provide the Plaintiff with

30

adequate assurance of performance.

Analyzing the first sentence of this statement, we conclude that the Magistrate Judge never made a factual finding one way or the other. From the second sentence it appears that the Magistrate Judge applied the incorrect legal standard for awarding lost profits. Specialty must prove damages to a reasonable certainty. Advent Sys., 925 F.2d at 680. As with the 1065 valves, because neither Specialty nor its subcontractors had experience manufacturing the shells, substantial compliance with the contract requirements cannot be presumed through a course of performance. Specialty had the burden of demonstrating that the prototype shells were conforming and, if not, when any deficiencies could have been rectified. On remand, the Magistrate Judge needs to make (if possible) appropriate findings if, upon reconsideration, lost profits are to be awarded.

## C. The In-Line Valves Project

On cross-appeal, Specialty argues that it is entitled to lost profits based on the existence of an in-line valves contract. The Magistrate Judge concluded that the parties intended to enter into a contract, that the writing requirement for the Statute of Frauds was satisfied, but that lost profits were not recoverable because no agreement had been reached as to price, quantity and duration. Accordingly, he awarded Specialty only reliance damages.

31

We first conclude that the Magistrate Judge's finding that Superior and Specialty intended to contract is clearly erroneous. As a written contract was executed for both the 1065 valves and the shells projects, the parties' course of dealings indicates that contractual intent was formalized in a written document. The record also indicates that the parties were in the final stages of negotiating the in-line valves contract, but that they had reached no firm agreement. In a letter dated August 3, 1999, Brisbin wrote that the in-line valves "program has not been officially granted [to] Specialty Manufacturing and we do not have currently a long-term contract agreement for this program." Further, Brisbin testified that, in June 1999, he began "requesting information" on the status of the in-line valves project because he had been told a long-term agreement "would be forthcoming." He also "repeatedly asked [Joe Kilmer] about getting my [in-line] check valve contract, and he said, 'They're still evaluating it.'" On cross-examination, Brisbin admitted that a draft agreement had not yet been exchanged between the parties and that the two sides were only working toward a final contract.

Even assuming Superior and Specialty intended to agree, no contract was formed. A contract with open terms will "not fail for indefiniteness if . . . there is a reasonably certain basis for giving an appropriate remedy." 13 Pa. Cons. Stat. § 2204(c). The Magistrate Judge concluded, however, that there was no "meeting of the minds" as to price, quantity

32

and contract duration. Thus, no contract was formed as a matter of law. Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd., 426 A.2d 1152, 1154 (Pa. Super. Ct. 1981) (stating that, "[t]o be enforceable, a contract must . . . represent a meeting of the parties' minds on the essential terms of their agreement"); see also Black's Law Dictionary 224 (6th ed. 1991) (defining a contract as an "agreement between the parties that gives each a legal duty to the other and also the right to seek a remedy for the breach of those duties").

Specialty points to evidence in the record — including price quotes, quantity estimates and duration ranges — to argue that these essential terms are ascertainable. But as discussed above, the evidence in the record establishes that the parties were still negotiating a final agreement. Accordingly, we agree with the Magistrate Judge's finding that no final agreement was reached as to price, quantity and duration of a putative in-line valves contract.[12]

---

[12] The Magistrate Judge held in the alternative (that is, assuming the lack of an in-line valves contract) that Specialty could recover as reliance damages its development and start-up expenses for the in-line valves project under a promissory estoppel theory. See, e.g., GMH Assocs., Inc. v. Prudential Realty Group, 752 A.2d 889, 904 (Pa. Super. Ct. 2000) (recognizing reliance damages for promissory estoppel). The record establishes, and Superior does not dispute, that Specialty began development of and incurred expenses for the in-line

33

**D. Prejudgment Interest**

Specialty also challenges the Magistrate Judge's decision to exclude prejudgment interest from the damages award. The Pennsylvania Supreme Court has stated that "the right to interest upon money owing upon contract is a legal right . . . [which] begins at the time payment is withheld after it has been the duty of the debtor to make such payment." Fernandez v. Levin, 548 A.2d 1191, 1193 (Pa. 1988) (citations omitted); see also Somerset Cmty. Hosp. v. Mitchell & Assocs., Inc., 685 A.2d 141, 148 (Pa. Super. Ct. 1996) ("It is well established that in contract cases . . . prejudgment interest is awardable as of right."). Prejudgment interest "is a right which arises upon breach or discontinuance of the contract provided the damages are then ascertainable by computation and even though a bona fide dispute exists as to the amount of the indebtedness." Palmgreen v. Palmer's Garage, Inc., 117 A.2d 721, 722-23 (Pa. 1955) (citations omitted).

Based on this standard, the Magistrate Judge declined to award prejudgment interest, concluding there was insufficient evidence to determine when the right to payment accrued. Initially, we note the inconsistency in the Magistrate Judge's decision. If the record does not establish the date on

valves project in reliance on promises and requests made by Superior.

34

which the right to payment would accrue (*i.e.*, when full-time production would have begun), how could he conclude that Specialty had established lost profits to a reasonable certainty?

As set out above, the Magistrate Judge should award lost profits on remand only if he makes findings as to when production for the 1065 valves and the shells would have begun. If those findings can be made, prejudgment interest may be calculated based on prorated monthly production figures (derived from findings as to annual production amounts). But if no lost profits are awarded, Specialty would be entitled to prejudgment interest only on its reliance damages beginning on the date of contract repudiation. See Fernandez, 548 A.2d at 1193 (concluding a party is entitled to prejudgment interest from the date the right to payment accrues).

\* \* \* \* \*

In this context, the decision of the Magistrate Judge is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion.

35